**SO ORDERED.**

**SIGNED this 07 day of May, 2007.**



_____
                **ROBERT E. NUGENT**
**UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| MILK PALACE DAIRY, LLC., | ) | Case No. 03-16743 |
| | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| MILK PALACE DAIRY, LLC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. No. 05-5867 |
| | ) | |
| L & K GRAIN PRODUCERS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

1

**MEMORANDUM OPINION**

Milk Palace Dairy, LLC ("Milk Palace"), as debtor-in-possession, filed this adversary proceeding to avoid and recover two alleged preferential transfers it made to defendant L & K Grain Producers Inc. ("LK Grain") under 11 U.S.C. § 547(b).[1] LK Grain asserts the "ordinary course" affirmative defense under § 547(c)(2).

The parties submitted stipulations of fact within the pretrial order.[2] The case was tried on March 27, 2007. Milk Palace appeared by W. Thomas Gilman of Redmond & Nazar, L.L.P. LK Grain appeared by Timothy J. King of Speth & King. After hearing testimony and receiving exhibits, the Court is now ready to rule and makes its findings of facts and conclusions of law in accordance with Fed. R. Civ. P. 52 and Fed. R. Bankr. P. 7052.

Jurisdiction

This is a core proceeding under 28 U.S.C. § 157(b)(2)(F) over which the Court has subject matter jurisdiction.[3]

Findings of Fact

Based on the stipulations and the evidence presented at trial, the Court finds the following. Milk Palace filed for Chapter 11 relief in this Court on December 15, 2003. LK Grain is an insider of Milk Palace pursuant to § 101(31). LK Grain has sold hay to Milk Palace since 1998. Milk Palace agreed to purchase alfalfa from LK Grain[4] and, pursuant to the parties'

---

[1] Subsequent statutory references are to the Bankruptcy Code, 11 U.S.C. § 101, *et seq.* unless otherwise noted.

[2] Dkt. 13.

[3] 28 U.S.C. § 157(b)(1) and § 1334(b).

[4] Exhibit 1, page 10.

2

written agreement, LK Grain would cut alfalfa about every 28 days during haying season and deliver it in round bales to Milk Palace. Payment for the hay would be due "on the 10th day of the [month] following harvesting."[5]

Larry Schneck, president and owner of LK Grain, testified that in a typical season, hay is cut on a 28 to 40 day cycle, yielding four or five cuttings a season. Buyers generally pay after each cutting is completed and the hay delivered. According to Mr. Schneck, Milk Palace, like other dairies, normally paid for hay within 30 days of complete delivery. LK Grain grows the hay, but uses a custom cutter to cut, process, and haul its hay.

Milk Palace seeks to recover two payments as preferences. On January 16, 2003, Milk Palace paid LK Grain $6,129.50 (the "January payment") for alfalfa hay cut in November 2002 during the fourth cutting of the season. Several truckloads of hay from this cutting were delivered to Milk Palace on November 11 and 12, 2002. LK Grain delivered the final four bales on December 10, 2002. Schneck testified the delay in delivery of the final four bales was due to his custom cutter's busy schedule. He explained that his custom cutter must have left the final four bales at the edge of the field and got so busy he did not deliver them "until I [] started [] saying I need these delivered so that I can get paid."

On October15, 2003, Milk Palace paid LK Grain $18,551.89 in connection with the third cutting of the 2003 season, completed and delivered on September 4, 2003 (the "October payment"). This also included payment for custom farm work performed by LK Grain ($8,376.43 was for hay, while $10,175.46 was for custom farm work). Milk Palace makes no claim of avoidance for the custom farm work. Schneck testified he personally hand-delivered an

---

[5] *Id.*

invoice for the custom work to Milk Palace on October 15, 2003. [6] Milk Palace gave him check no. 2124 in the amount of $18, 551.89 that same day. Schneck testified that it was normal practice for him to hand-deliver invoices and that it was not uncommon for him to be paid the same day.

Clayton McCarty, a managing partner of McCarty Dairy with lifetime experience in the dairy business, testified that most dairies try to pay their hay suppliers per invoice or shortly thereafter.

Conclusions of Law

Milk Palace seeks to recover the January and October payments as preferential transfers under 11 U.S.C. § 547(b). By stipulating to the elements of § 547(b), LK Grain concedes that the payments were preferences, but relies on the "ordinary course" exception provided for under § 547(c)(2) as a defense to each. As to the January payment, LK Grain relies on the fact that the payment came within about thirty days after the final four bales were delivered, in keeping with the thirty day payment pattern of long-standing between the parties. As to the October payment, LK Grain argues that the 41 days between delivery and payment are not sufficiently extraordinary to place the payment outside the ordinary course. LK Grain also denies that Mr. Schneck's personally calling on the debtor with an invoice was not unusual collection activity given the relationship of the parties.

Section 547(c)(2) provides that the trustee may not avoid a transfer to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was –

---

[6] Exhibit D.

4

(A) made in the ordinary course of business or financial affairs of the debtor and transferee; and
(B) made according to ordinary business terms.[7]

LK Grain, as the recipient of the payments, has the burden of proving by a preponderance of the evidence, that the payments fall within § 547(c)(2).

Many courts recognize that this defense has both a subjective and an objective test.[8] The Tenth Circuit Bankruptcy Appellate Panel has held that the subjective test examines whether the transfers at issue were "ordinary as between the parties" and the objective test examines whether the transfers were "ordinary in the industry."[9] A transaction must meet both tests in order to qualify as an exception. A defense under § 547(c)(2) should be narrowly construed.[10]

Courts consider four primary factors to determine if payments are ordinary between the parties as required under the subjective test: (1) the length of time the parties were engaged in the transaction in issue; (2) whether the amount or form of tender differed from past practices; (3) whether the debtor or creditor engaged in any unusual collection or payment activity; and (4) the circumstances under which the payment was made.[11] These factors are typically considered by comparing pre-preference period transfers with preference period transfers.[12] In the absence

---

[7] 11 U.S.C. § 547(c)(2).

[8] *See* William L. Norton and William L. Norton, Jr., NORTON BANKRUPTCY LAW AND PRACTICE, 2ND ED., § 57:20 (2005).

[9] *Payne v. Clarendon Nat'l Ins. Co. ( In re Sunset Sales, Inc.)*, 220 B.R. 1005, 1020 (10th Cir. BAP 1998).

[10] *Id.*

[11] *Id.* at 1021-1022.

[12] *Id*. at 1022 (citations omitted).

of any prior transactions, courts typically look to see if the debtor complied with the payment terms of its contract.[13] Late payments are typically not "ordinary," unless the creditor establishes that a pattern of late payments was ordinary between the parties.[14] In interpreting the objective test, the Tenth Circuit has held that "ordinary business terms" are terms used in "'normal financing relations:' the kinds of terms that creditors and debtors use in ordinary circumstances, when debtors are healthy."[15]

Determining what the "ordinary course" is in the farming industry is particularly subjective. The parties here had a written agreement that LK Grain would pay for its hay on the tenth day of the month after it was cut. By all indications, this payment term was only honored in the breach. Even the most detailed written agreements (and this agreement does not meet that standard) often yield to the same random forces and modes of human interaction that animate agriculture in general. Cutting, baling and hauling cycles may be affected by weather and the availability of equipment and labor. Invoicing and payment may also occur on a far less stringent schedule than that observed by businesses "in town." The evidence suggests that, in this case, Milk Palace paid for hay within thirty days of full delivery notwithstanding the contractual provisions.

With respect to the January payment, Milk Palace argues that it is outside industry norm to leave four bales of hay out in the field and not deliver them promptly. In addition, prompting the custom cutter to deliver the final four bales in order to collect payment is an unusual

---

[13] *Id.*

[14] *Id.*

[15] *Clark v. Balcor Real Estate Fin., Inc. (In re Meridith Hoffman Partners)*, 12 F.3d 1549, 1553 (10th Cir. 1993).

collection activity. The debtor made the January payment 36 days after the December 10 day delivery. Although the January payment came six days outside the thirty-day payment period, it does not appear to represent a departure from the parties' customary thirty day pattern. Nor does it appear to have been the result of extraordinary collection activity. Prompting the custom cutter to deliver the final four bales simply triggered the payment. The Court concludes that the January payment to be within the ordinary dealings of these parties and consistent with McCarty's testimony that his and most dairies try to pay their hay suppliers per invoice or shortly thereafter.

With respect to the October payment, made 41 days after the September 4 hay delivery, Milk Palace argues that hand-delivery of an invoice with expectations of same day payment is an unusual collection activity. Schneck testified that it was not unusual for him to hand-deliver an invoice and that it was not uncommon to be paid on the same day. He did not necessarily expect payment on the same day. As noted above, the invoices in question covered not only hay delivered from the third 2003 cutting, but also custom farming work that had only been completed on October 2, 2003. Delivering the custom farm invoice, payable "on receipt," at the same time that LK Grain sought payment for the September hay does not strike the court as an "unusual collection practice" in the farming context. Although the October payment came eleven days outside the thirty-day payment period, it appears the invoice was not presented until October 14. Indeed, it appears that the hay was not moisture-tested until October 1, 2003.[16]

Applying the four factors of the subjective test, both payments were made in the ordinary course of the parties' business. Neither was "so idiosyncratic as to fall outside that broad range

---

[16] *See* Exhibit 3.

[that] should be deemed extraordinary and therefore outside the scope of subsection [(B)]."[17] The Court finds that LK Grain has demonstrated by a preponderance of the evidence that both payments were made in the ordinary course of the parties' business and according to ordinary business terms. Thus, LK Grain is entitled to the defense of § 547(c)(2).

Judgment should therefore be entered for defendant LK Grain on the complaint, each party to bear their costs. A judgment on decision will issue this day.

# # #

---

[17] *Matter of Tolona Pizza Products Corp.*, 3 F.3d 1029, 1033 (7th Cir. 1993).